**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **ANNE BYBEL, M.D.,** | : | **CIVIL ACTION** |
| **Plaintiff** | : | |
| | : | |
| **v.** | : | **NO. 09-570** |
| | : | |
| **METROPOLITAN LIFE** | : | |
| **INSURANCE COMPANY;** | : | |
| **LINCOLN NATIONAL** | : | |
| **LIFE INSURANCE COMPANY,** | : | |
| **Defendants** | : | |

**M E M O R A N D U M**

**STENGEL, J.**                                                          **November  18,  2010**

Anne Marie Bybel was a practicing obstetrician/gynecologist until she suffered a shoulder injury as a result of an accident that occurred while she was delivering a baby. When her injuries prevented her from performing her duties and she was terminated from her hospital position, she made a claim under her disability insurance policy.  The defendant, her insurer, denied it.  Dr. Bybel has filed suit against the defendant for breach of contract and bad faith arising out its refusal to award her total or partial disability benefits.  For the reasons set forth below, I will deny the defendant's motion for summary judgment on her claims.

**I.      BACKGROUND[1]**

At all times material to this action, Dr. Bybel was a board certified obstetrician/gynecologist ("OB/GYN") practicing full time with Northern Lancaster

---

[1]  The following facts are based on the undisputed evidence of record and the disputed evidence of record viewed in the light most favorable to Dr. Bybel.

County Medical Group ("NLCMG"), a group affiliated with Ephrata Community Hospital ("ECH"). Def.'s Statement of Undisputed Material Fact ("SUF") ¶ 11. While in practice, obstetrics made up 50% of Dr. Bybel's practice, and gynecological duties comprised the other 50%.[2] Def.'s SUF ¶ 11. She claims the main duties of an OB/GYN include "independently delivering babies by whatever means necessary (natural, causarean, forceps-assisted, vacuum-assisted); independently performing gynecological surgeries; and on-call work, which requires the ability to independently perform the delivery and surgical functions described above." Bybel Compl. ¶ 18. On December 23, 2005, Dr. Bybel was pushed in the right shoulder (her dominant one) by an obese patient during a delivery. Pl.'s SUF ¶ 13. She worked through pain in that shoulder until March of 2006, when it became so intense she was admitted to the emergency room. Id. ¶ 13. She then began to see an orthopaedic surgeon, Dr. Thomas Renz, who attempted to treat Dr. Bybel without surgery. Id. ¶ 13. When that proved unsuccessful, she had an operation on September 21, 2006. Id. That, too, was ineffective. Id. Despite seeking treatment from multiple orthopaedic surgeons and attending physical therapy regularly, Dr. Bybel continues to have disabling pain and weakness in her right shoulder. See Pl.'s SUF ¶¶ 13, 28.

Between the initial injury and subsequent surgery in September, 2006, Dr. Bybel

---

[2] Obstetrics is the branch of medicine related to childbirth, while gynecology "deals with the diseases and routine physical care of the reproductive system of women." Merriam-Webster's Collegiate Dictionary, Eleventh Ed. 2005, 857, 558.

continued to work on a full-time basis.  Def.'s SUF ¶ 13.  When she returned to work in

December, 2006, it was part time and with restrictions.  Id. at ¶ 13, 28.  Specifically, Dr.

Bybel was unable to perform major surgeries, caesarian sections, difficult deliveries,

including those involving vacuums or shoulder dystocia, obstetrics, emergency room

work, or outpatient surgery.  Pl.'s SUF ¶ 28, Pl. Ex. 21.  Shortly after her return to work,

the other OB/GYNs in NLCMG wrote to ECH to complain about Dr. Bybel's inability to

provide full on-call coverage, because it required them to provide coverage for her.  Pl.'s

SUF ¶ 30(a).  On February 27, 2007, ECH wrote to Dr. Bybel noting that:

> Since your surgery on September 21, 2006, you have been under work
> restrictions that have impacted your ability to perform all of the
> essential functions of your position as an [OB/GYN] physician.  It is
> our understanding that you are presently unable to perform work that
> requires sustained pushing or pulling with more than 32 pounds of
> force.  This restriction impacts your ability to perform vacuum
> deliveries and other surgery and further impacts your on-call
> responsibilities.

Pl.'s Ex. 25.  On March 2, 2007, ECH wrote to Dr. Bybel again, this time stating that,

because she was "unable to perform all of the full-time duties of an OB/GYN physician"

upon which her compensation was based, it would be reduced by 59% "to reflect the

value of [her] services[.]" Pl.'s Ex. 26.  On March 8, 2007, the other physicians in

NLCMG decided that Dr. Bybel would only be allowed to perform gynecological office

work.  Pl.'s Ex. 27.  Again, on May 9, 2007, ECH wrote to Dr. Bybel confirming her

physical limitations:

> You are not currently performing all of the essential functions of your

> job, namely surgeries, deliveries, and on-call responsibilities. These are
> major components of your position as an OB/GYN physician. We
> agreed only to temporarily modify your responsibilities in this regard,
> and we will not nor can we excuse you on a permanent basis from
> performing these essential responsibilities.

Pl.'s Ex. 28. ECH later denied Dr. Bybel's request to perform surgery, noting that her doctor did not release her to perform surgery, that performing surgery would conflict with the evaluation of her functional capacity by the Philadelphia Hand Center, and that her condition would require the presence of a back-up surgeon were an emergency to arise. Pl.'s Ex. 29. Finally, on July 25, 2007, she was terminated. The termination letter she received from ECH stated:

> For a period of more than (6) months, you have been unable to perform
> all of the essential functions of your job, namely vacuum deliveries and
> surgeries. There are no reasonable accommodations that would enable
> you to perform these essential functions. Furthermore . . . you will
> continue to be unable to perform all of your essential job functions for
> a minimum of four (4) to six (6) months, at which time the doctor could
> only verify that you should be re-evaluated, not that you would resume
> performing your essential functions.

Pl.'s Ex. 30. In conjunction with her termination, ECH offered Dr. Bybel a position doing gynecological office work only and not performing surgeries or OB/GYN deliveries. Pl.'s Exs. 31, 32. She rejected the offer because it would have precluded her from performing obstetrics for a period of two years and upon completion of those two years, she would have to obtain the approval of the hospital administration to resume these duties. See Pl.'s Ex. 12, Bybel Dep., 218:9–220:19. Dr. Bybel was under the impression at the time of her termination that with continued therapy, she could be able to

return to her full capacity at work. Bybel Dep. 181:1–20.

Following her termination, Dr. Bybel filed a discrimination complaint with the EEOC, arguing that she was fired because she had previously accused another doctor in her group of sexual harassment, and because of her disability. See Def. SUF ¶ 17. The EEOC ruled against her, finding that she was unable to perform vacuum extractions, surgery, and on-call duty, and that, under the ADA, the hospital was not required to provide her with an accommodation by requiring that other physicians be made available to assist her in performing the essential functions of her job. Pl.'s Ex. 13 ("[F]or Dr. Bybel to rely on the on-call physician to perform an essential function of her job is tantamount to reassigning essential functions.").

Dr. Bybel has offered evidence in the form of independent functional evaluations and expert reports that she is fit for office work only, has impaired right hand coordination, decreased right shoulder range of motion and strength, and that she can only push or pull up to 30 pounds with her right arm. See, e.g. Pl.'s Ex. 8, Raptosh Evaluation; Pl.'s Exs. 38, 40 Dantuluri Evaluations; Pl.'s Exs. 18, 19, Chesky Evaluation & Notes (finding that Dr. Bybel could not lift or carry or forcefully push or pull more than thirty pounds with her right arm and clearing her to perform deliveries and surgeries "as long as assistant available *in house* to assist in deliveries and surgeries should complications arise necessitating need for additional force being applied [greater than] thirty pounds[.]"); Pl.'s Ex. 35, Oxendine Evaluation. Her expert, Dr. Arnold Cohen,

opines based on his experience as a obstetrician/gynecologist that Dr. Bybel is "unemployable as a fully functioning obstetrician/gynecologist" because her shoulder injury "continues to limit her abilities to care for the acute, unexpected events that occur in providing surgical and obstetrical care." Cohen Report, Pl.'s Ex. 42. He explains that:

> "[t]here is no way to predict when surgery will require acts that she no longer can perform or when a difficult delivery will require forceps application or a vacuum extraction. If Dr. Bybel were to assume the function of an obstetrician it would be unpredictable whether she could or could not deal with a specific case management based on the amount of force or endurance required for that individual delivery."

Id.

Since her termination, Dr. Bybel has remained unemployed. Def.'s SUF ¶ 20. She claims she would be able to perform office-based gynecology work but has been unable to find a position. Id.; see Bybel Dep. 26: 10–13. She admitted during her deposition that she can perform "the entire gamut of office-based gynecological services," "the overwhelming majority of obstetrical services, with the exception of a vacuum extraction delivery that requires the exertion of forces in excess of 50 pounds," and that she could perform call "with the necessary accommodation of an assistant in the event of a vacuum extraction as required or a physician to perform surgical services." Id. at 186:7–187:24.

Dr. Bybel has had a disability income insurance policy with Lincoln National Life Insurance Company since 1991.[3] Def. SUF ¶ 1. It provides that she is entitled to benefits

---

[3] After 1991, Metropolitan Life Insurance Company ("MetLife") became the reinsurer and administrative agent for the policy. Because the parties refer to MetLife throughout their briefs as the party responsible for reaching the decision to reject Dr. Bybel's claim, I will refer to either MetLife or "the defendant" throughout.

for either total or residual disability.  <u>See</u> Insurance Policy of Anne Marie Bybel, Ex. A to

Affidavit of Kris Anderson ("Policy"), at 5.  The policy provides:

> "Total Disability" means that because of Injury or Sickness:
>> a.      You cannot do the main duties of Your Occupation
>> b.      You are under a Physician's Care; and
>> c.      You are not engaged in any other gainful occupation
>
> "Residual Disability" means that during the Elimination Period because of injury or sickness:
>> a.      You are not able to do one or more of the main duties of Your Occupation, or You can perform all of Your normal duties but not for as much time as is normally required to perform them; and
>> b.      You are under a Physician's Care; and
>> c.      Your Current Monthly Income is 80% or less of Your Prior Monthly Income
>
> Following the Elimination Period, Residual Disability means that due to the continuation of that injury or Sickness:
>> a.      Your Current Monthly Income is 80% or less of Your Prior Monthly Income; and
>> b.      You are under a Physician's Care.

<u>Id.</u> at 4-5.  Under the policy, the "'Elimination Period' is the number of days, beginning

with the day Your Total or Residual Disability starts, for which no disability benefits are

provided."  <u>Id.</u> at 4.  "'Occupation' means the occupation (or occupations, if more than

one) in which You are engaged at the start of Your disability."  <u>Id.</u>

Dr. Bybel notified MetLife of her intent to make a claim for disability benefits in

December, 2007.  Def.'s SUF ¶ 21.  She said her last day of work was September 20,

2006.  <u>Id.</u> at ¶ 21.  The defendant initially denied Dr. Bybel's claim in March of 2008.

Anderson Dep. 68:24–69:5.  After the elimination period, it began making monthly

disability payments to Dr. Bybel at 50% of the monthly total disability benefit.  <u>Id.</u> at ¶

22.  It later determined that Dr. Bybel was residually disabled for the period from September 21, 2006 through March 15, 2007, and paid her 50% of the total disability benefits accrued during that period, minus the Elimination Period.  Id. at ¶ 24.

Dr. Bybel filed a four count complaint in this court on February 2, 2009.  Count I alleges that defendant breached its duty under the policy to pay total disability benefits; Count II alleges in the alternative that defendant breached its duty under the policy by failing to pay Residual Disability benefits; and Count III alleges that defendant has exhibited bad faith by denying Dr. Bybel's claim for benefits without a reasonable basis and has recklessly disregarded that lack of a reasonable basis.  Dr. Bybel stipulated to the dismissal of Count IV of her complaint, which asserted a claim against MetLife for tortious interference with contractual relations.

## II.    STANDARD OF REVIEW

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  FED. R. CIV. P. 56(c).  An issue is "genuine" when a reasonable jury could return a verdict for the non-moving party based on the evidence in the record. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  A factual dispute is "material" when it could affect the outcome of the case under the governing law.  Id.

A party seeking summary judgment initially bears responsibility for informing the

court of the basis for its motion and identifying those portions of the record that it believes demonstrate the absence of a genuine issue of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  Where the non-moving party bears the burden of proof on a particular issue at trial, the moving party's burden can be met simply by demonstrating "to the district court that there is an absence of evidence to support the non-moving party's case."  Celotex, 477 U.S. at 325.  After the moving party has met its initial burden, "the adverse party's response, by affidavits or otherwise as provided in this rule, must set forth specific facts showing that there is a genuine issue for trial."  FED. R. CIV. P. 56(e).  Summary judgment is therefore appropriate when the non-moving party fails to rebut by making a factual showing "based on the affidavits or by depositions and admissions on file" that is "sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  Celotex, 477 U.S. at 322; Harter v. GAF Corp., 967 F.2d 846, 852 (3d Cir.1992).

## III.    DISCUSSION

### A.    Dr. Bybel's Breach of Contract Claims

If Dr. Bybel is to survive summary judgment on Counts I and II of her complaint, she must provide evidence sufficient for a jury to find that she is totally disabled because she "cannot do the main duties of [her] occupation" or that she is residually disabled because she is "not able to do one or more of the main duties of [her] occupation."

Pennsylvania law controls in construing the language of Dr. Bybel's Policy.[4]

"Under Pennsylvania law, the interpretation of an insurance contract is a matter of law for the court." Lexington Ins. Co. v. W. Penn. Hosp., 423 F.3d 318, 323 (3d Cir. 2005) (citing Madison Constr. Co. v. Harleysville Mut. Ins. Co., 557 Pa. 595, 735 A.2d 100, 106 (1999)). "The goal of interpreting an insurance policy . . . is to determine the intent of the parties." Mercersburg College, 458 F.3d at 171. This task begins with the language of the policy. Id. Where the terms of a provision are clear and unambiguous, they must be given their plain and ordinary meaning. St. Paul Fire & Marine, 935 F.2d at 1431. Where terms are ambiguous, they must be construed in favor of the insured and against the insurer, as drafter of the agreement. Lexington Insurance, 423 F.3d at 323. "Contractual language is ambiguous if it is reasonably susceptible of different constructions and capable of being understood in more than one sense." Id. (citing Madison Construction, 735 A.2d at 106). Courts should take care not to distort the meaning of contractual language to find an ambiguity where there is none. See USX Corp. v. Liberty Mutual Ins. Co., 444 F.3d 192, 198 (3d Cir. 2006). The meaning of any one term in a policy will necessarily be informed by what surrounds it; in fact, a court must not interpret any provision of a contract without reference to the entire document.

_____

[4] Where jurisdiction is based on diversity of citizenship, the reviewing court applies the law of the state where the District Court sits. St. Paul Fire & Marine Ins. Co. v. Lewis, 935 F.2d 1428, 1431 n.3 (3d Cir. 1991). Under Pennsylvania choice of law rules, an insurance contract is governed by the law of the state where it was made. See Regents of Mercersburg College v. Republic Franklin Ins. Co., 458 F.3d 159, 163 (3d Cir. 2006). The parties do not appear to dispute that Dr. Bybel's policy was "made" in Pennsylvania.

See Capitol Bus Co. v. Blue Bird Coach Lines, Inc., 478 F.2d 556, 560 (3d Cir. 1973) ("A contract is to be considered as a whole, and, if possible, all its provisions should be given effect[.]").  Moreover, "a contract should be construed so as to give effect to its general purpose."  Id.

### 1.    Dr. Bybel's Claim for Total Disability Benefits

The defendant does not dispute that the occupation in which Dr. Bybel was engaged at the start of her disability was that of full time obstetrician/gynecologist.  It does not appear to dispute that all manner of deliveries, including vacuum deliveries and cesarian sections, and on-call work, were main duties of her occupation.  Rather, MetLife claims Dr. Bybel cannot claim total disability benefits as a matter of law because "with the exception of a few discrete and rarely performed tasks (vacuum deliveries and surgeries lasting over one (1) hour), Bybel was fully capable of performing her main duties at all times material to this lawsuit."  Def.'s Mem. Of Law, 5.  In other words, the defendant argues that because Dr. Bybel can perform *most* of the main duties of her occupation, she does not qualify as totally disabled.

In support of its position, MetLife cites a letter sent by Dr. Bybel's former attorney in regards to her EEOC claim.  This letter states that NLCMG  "provided back-up on-call assistance [for Dr. Bybel] for the rare times that vacuum deliveries and cesarean sections were necessary."  Def.'s SUF ¶ 12.  It also cites the portion of Dr. Bybel's deposition testimony in which she states that vacuum assisted deliveries constituted only 5 to 15% of

the total deliveries she performed, that she performed only approximately two C-sections per month, and that at the time of her termination she could perform the full range of gynecological office work, and most office obstetrical work. Id. at 5-6. Finally, it claims that ECH's offer of full-time office-based gynecological work, and the fact that Dr. Bybel has sought office-based gynecological work following her termination, show that she was and is capable of fully performing the main duties of her occupation. Id. at 7.

Dr. Bybel responds that her physical limitations render her unable to perform the main duties of her job, pointing to her inability to perform emergency work and long or difficult surgeries, including those involving vacuums or shoulder dystocia. Pl.'s Resp. To Def.'s Mot., 5. She cites the letters she received from ECH confirming that following her surgery, she was "not currently performing all of the essential functions of [her] job, namely surgeries, deliveries, and on-call responsibilities," tasks it considered "major components of [her] position as an OB/GYN physician." Id. at 6-7. Dr. Bybel also points out that Kris Anderson, the MetLife agent who handled Dr. Bybel's claim, admitted that no doctor retained by MetLife or by Dr. Bybel ever stated that she could perform her occupation without restrictions. Id. at 13 (citing Anderson Dep. 48:13–49:5).

Whether Dr. Bybel's breach of contract claim for the defendant's failure to award her total disability benefits should go to a jury boils down to the issue of whether her policy must be interpreted as a matter of law to award benefits only where the claimant is unable to perform all of the main duties of her job. MetLife claims reading the total

disability provision to apply to a situation where it is undisputed that the claimant can still perform most of the main duties of her occupation renders the residual disability portion of the clause meaningless. The total disability provision requires that the claimant "cannot do the main duties of [her] occupation," while the residual disability portion requires that the claimant is "not able to do one or more of the main duties of [her] occupation." Although the word "all" does not appear before "main duties" in the total disability clause, when read in the context of the residual disability clause, one could construe this as meaning that total disability requires an inability to do *all* main duties. Indeed, Dr. Bybel admits that she can still perform most of the duties of a full-time OB/GYN, in that she can do all office based gynecological work, most office-based OB work, and simple deliveries. Ignoring exact percentages for the sake of argument, it is undisputed that Dr. Bybel can perform somewhere between some and most of the main duties of an OB/GYN.

On the other hand, the practical effects of Dr. Bybel's injury are undeniable. Both her employer and the EEOC deemed her unable to perform the essential functions of her job, and before she was fired but after she was deemed capable of doing only office-based work (the work she would have continued to do had she accepted the modified job offered to her when she was terminated), her salary was reduced by 59%. That she is unable to do on-call work essentially means that she cannot perform deliveries without the availability of another physician to assist her. Practically speaking, a fact-finder could

-13-

easily conclude that an OB/GYN's inability to fully and independently handle the delivery of a baby, with all of its possible complications, would render that OB/GYN unable to perform the main duties of her job.

In the context of an ERISA action, the Third Circuit considered whether an orthopaedic surgeon who returned to work following a heart attack was disabled under the terms of an insurance policy.  See Lasser v. Reliance Standard Life Ins., 344 F.3d 381 (3d Cir. 2003).  Looking to the physician's earnings decline of 50% after he became unable to handle night call and emergency surgeries, it concluded that his reduced earnings capacity "lays out as little else can the materiality of those activities to his regular occupation." Id. at 387.  However, a key factual distinction between Lasser and this case is that the disability policy in Lasser provided for disability benefits if, as a result of disability, the claimant was "capable only of performing the material duties of his/her regular occupation on a part-time basis or some of the material duties on a full-time basis." Id. at 385.  The court wrote of no distinction between total and residual disability coverage, and the language of Lasser's policy providing coverage if he was capable only of performing "some of the material duties" of his position more closely tracks the language contained in the residual disability provision of Dr. Bybel's policy.

Other courts have considered policies which, like Dr. Bybel's, contain both a total and a residual disability provision.  Recently, in Klay v. AXA Equitable Ins. Co., No. 09-12, 2010 WL 3885117 (W.D.Pa. Sep. 28, 2010), the court granted summary judgment in

favor of the insurer where the physician claimant had to show "inability due to injury or sickness to engage in the substantial and material duties of [his] regular occupation" to qualify as totally disabled. Id. at *12. The plaintiff, a cardiothoracic and vascular surgeon, was diagnosed with diabetes and became unable to perform open heart surgeries and lengthy and complex vascular surgeries. Id. at *13. The court recognized that the plaintiff could still perform some types surgeries that were not "insubstantial or unimportant." Id. at *14. It ruled that because the plaintiff could perform some duties of his regular occupation, his claim fell squarely into the residual disability provision of his policy, which was triggered by an "inability due to sickness or injury to perform . . . one or more of the substantial duties of your occupation[.]" Id. at *17.

In DiTommaso v. Union Central Life Ins., No. 89-6323, 1991 WL 124601 (E.D.Pa. July 8, 1991), the court ruled in favor of the insurer where the policy provided that total disability "continuously prevents the insured from engaging in the regular occupation of the insured at the time disability begins." Id. at *2. The residual disability provision was triggered "where the insured is unable to perform one or more of the insured's daily business duties[.]" Id. Faced with the plaintiff's argument that he was totally disabled because he was unable to perform all of his former duties, including general medicine, surgery and manipulations, Judge Reed concluded that:

> It is unnecessary, however, to reach the issue of what portion of plaintiff's practice was comprised of surgery and manipulations. Based on the plain language of the policy as a whole, the total disability clause is subject to only one reasonable interpretation. The policy provides for

total disability when a person is unable to perform his or her regular occupation at the time of disability.

Plaintiff's occupation is an osteopathic physician. Since he is still earning his primary living as an osteopathic physician he cannot be considered totally disabled. Whether he is unable to perform one or more duties of his occupation, even significant or substantial ones, is irrelevant to the conclusion from the plain language of the policy that plaintiff is still in the same occupation.

Id. at *3.

Both Klay and DiTommasso are therefore distinguishable from this case in one very important respect — while the plaintiffs there had to contend with the fact that they were still practicing medicine largely in the form they had prior to becoming disabled, Dr. Bybel is no longer in practice as an OB/GYN because she was found by her employer to be unable to perform the essential functions of her job. When she was terminated, she was offered a distinctly different position as an office-based gynecologist.

I cannot find as a matter of law that the terms of the total disability portion of Dr. Bybel's policy apply only to situations where an insured is unable to perform *all* the main duties of her occupation. While I am required to read the terms of the policy together as a whole, I am also required to construe the policy to give effect to its general purpose. To find that the terms of the policy do not afford total disability coverage for an injury which resulted, among other things, in the claimant being deemed by her employer unable to perform the essential functions of her job, terminated from her position as a full time OB/GYN, and rendered unable to deliver a baby without the guarantee of assistance from

-16-

other physicians, would contradict the intent of the parties and the purpose of a disability insurance policy.

I will deny defendants' motion for summary judgment on Count I of Dr. Bybel's complaint, because there is a genuine issue of fact whether she was totally disabled under the terms of the Policy.

### 2.    Dr. Bybel's Claim for Residual Disability Benefits

The defendant claims that, even assuming Dr. Bybel is unable to perform one or more of the main duties of her occupation, she is still not entitled to residual disability benefits because her inability to work is due not to her illness or injury but because she chooses not to work.  Def.'s Mem., 9.

It in unquestionable that Dr. Bybel meets the terms of the policy for her residual disability claim.  She has demonstrated with ample evidence that she is unable to perform one or more of the duties of her regular occupation.  There is no contractual interpretation issue remaining on Dr. Bybel's residual disability claim; rather, the only remaining question is whether Dr. Bybel's refusal to accept the modified, office-work only position offered to her when she was terminated from her position as a full time OB/GYN, precludes her from collecting under the residual disability provision of the policy.

In support of its argument, the defendant cites Moskowitz v. Prudential Ins. Co. of America, 35 A.2d 567, 569 (Pa. Super. Ct. 1944), in which the plaintiff, a baker who lost four fingers and then refused to take part even in the non-manual, managerial aspects of

running the bakery he owned, was found ineligible for total disability benefits. That case is easily distinguishable from this one. Dr. Bybel has provided a believable explanation for her rejection of the office position with ECH, claiming that, because she thought she would be able to resume the full range of her duties as an OB/GYN, the two year restriction on such work, and the fact that she had to obtain approval before resuming such work at the end of those two years, was too restrictive. Moreover, Dr. Bybel testified that she has continued to seek employment as an office-based gynecologist since her termination. She explained during her deposition that she has looked for such positions and is unable to find an employer willing to take her on in that capacity. Her expert, Dr. Cohen, testified that she is unemployable as a full-time OB/GYN. Therefore, I believe there is a material fact issue whether Dr. Bybel is able and simply unwilling to find work. She has presented evidence in the form of her own testimony and that of her expert that her physical limitations have prevented her from finding work as an OB/GYN, office-based or not.[5]

Finally, the defendant argues that any damages under a residual disability claim would be "too speculative to assess" because Dr. Bybel is abstaining from work. This is a

_____

[5] The defendant has also presented evidence that since termination from her position, Dr. Bybel has enrolled in school in Harrisburg to pursue continuing education classes, traveled extensively for speaking engagements and classes, and spent a significant amount of time driving her son to and from South Carolina for school. See Def.'s Mem., 10; Def.'s SUF ¶ 25. However, I find this evidence irrelevant. The clear language of the Policy pertains solely to the duties of Dr. Bybel's occupation, and simply does not contemplate that her ability to engage in activities—including driving, riding in airplanes, or attending class—that are unrelated and unnecessary to her occupation renders her disqualified for benefits.

weak argument. As noted by Dr. Bybel, a jury could use as a basis for damages the salary for the office-based gynecological position she rejected, and she would be entitled, under the terms of the policy, to the difference between that salary and her former, full-time salary, if the difference between them is 20% or more. See Policy ("Following the Elimination Period, Residual Disability means that due to the continuation of that injury or Sickness, (a) Your Current Monthly Income is 80% or less of Your Prior Monthly Income; and (b) You are under a Physician's Care.").

**B.    Dr. Bybel's Bad Faith Claim**

Dr. Bybel also asserts a bad faith claim against Lincoln and seeks damages under Pennsylvania's bad faith statute, codified at 42 PA. CONS. STAT. ANN. § 8371. Pennsylvania law imposes upon insurers a duty to act in good faith in investigating claims. This includes a duty to investigate claims fairly and objectively, and to reject claims only with good cause. See Parasco v. Pacific Indem. Co., 870 F.Supp. 644, 646 (E.D.Pa. 1994). Under Section 8371, an insurer guilty of bad faith may be made to pay interest on the amount of the claim, punitive damages, and fees and costs.[6] In the

---

[6] 42 PA. CONS. STAT. ANN. § 8371 provides:
> In an action arising under an insurance policy, if the court finds that the insurer has acted in bad faith toward the insured, the court may take all of the following actions:
>> (1) Award interest on the amount of the claim from the date the claim was made by the insured in an amount equal to the prime rate of interest plus 3%.
>> (2) Award punitive damages against the insurer.
>> (3) Assess court costs and attorney fees against the insurer.

insurance context, "bad faith" is defined as "any frivolous or unfounded refusal to pay proceeds of a policy[.]" Polselli v. Nationwide Mut. Fire Ins. Co., 23 F.3d 747, 751 (3d Cir. 1994). Although the statute itself does not define bad faith, the Pennsylvania Superior Court has ruled that in order to recover on a bad faith claim, a plaintiff must show with clear and convincing evidence that the insurer (1) lacked a reasonable basis for denying benefits under a policy; and (2) recklessly disregarded its lack of reasonable basis in denying the benefits. Terletsky v. Prudential Prop. & Cas. Ins. Co., 649 A.2d 680, 688 (Pa.Super. 1994). "[S]ection 8371 is not restricted to an insurer's bad faith in denying a claim. An action for bad faith may also extend to the insurer's investigative practices." O'Donnell ex rel Mitro v. Allstate Ins. Co., 734 A.2d 901, 906 (Pa.Super. 1999). In evaluating a motion for summary judgment, the reviewing court must consider the plaintiff's arguments in light of her high evidentiary burden at trial. See Serino v. Prudential Ins. Co. of America, 706 F. Supp. 2d 584, 589-90 (E.D.Pa. 2009).

Dr. Bybel argues that Lincoln failed fairly and objectively to evaluate her claim. She claims a jury could find that Lincoln's conclusion that she could perform the main duties of an OB/GYN "ignores the functional limitations that were repeatedly and consistently set in place in her treating physicians' reports, her occupational evaluation, her functional capacity evaluations, and her two independent medical examinations, and it also ignores the statements of her employer that she could not do her main duties[.]" Pl.'s

Resp. 24–25.

This court must evaluate whether Dr. Bybel's bad faith claim should survive summary judgment in light of the high burden she faces at trial. Dr. Bybel presents evidence that MetLife failed to consider all the evidence before it, failed to provide all available information it had to the consultants it retained to evaluate Dr. Bybel's claim, and misrepresented the evidence it had in describing Dr. Bybel's condition to its key consultant.

The evidence Dr. Bybel presents indicates that, in reaching a decision on her claims under the Policy, MetLife agent Kris Anderson did not have the expertise to reach a conclusion on his own. Anderson Dep. 30:11–21. He sought help from a business consultant and two doctors, Bernard Fishalow and James Von Thron, an OB/GYN. Id. at 30:22–31:6. To assist Dr. Von Thron in reaching a recommendation on whether Dr. Bybel was unable to perform her duties as an OB/GYN, Mr. Anderson gave him the information provided in the claim forms filled out by Dr. Bybel, a two-page functional capacity evaluation completed by Dr. Renz, the report from Dr. Bybel's shoulder surgery, and a report on the number of OB/GYN procedures Dr. Bybel performed before and after her surgery. See Pl.'s SUF ¶ 45 (citing Pl.'s Exs. 10, 47–50). Mr. Anderson did *not* give Dr. Von Thron any of the statements Dr. Bybel sent to MetLife about her disability, any of the letters written by ECH prior to and concerning her termination, information from the disability carrier for Dr. Bybel's employer, which accepted her claim for benefits, or

*any* information from Dr. Bybel's numerous other treating physicians and physical therapists. Pl.'s SUF ¶ 46 (citing Von Thron Dep).

In support of her claim that MetLife misrepresented the nature of her limitations to its own consultants, Dr. Bybel cites a letter sent to Dr. Von Thron from Mr. Anderson stating that: "[w]e have determined that Dr. Bybel's restrictions and limitations would include no lifting over 50 pounds or very forceful pulling on a continuous or repetitive basis." Pl.'s Ex. 48. While one evaluation available to Mr. Anderson represented that she could not perform certain procedures requiring over 50 pounds of force, another evaluation available to Mr. Anderson at that time indicated that Dr. Bybel's restrictions included "no lifting [greater than] 30 pounds [and] no pushing/pulling [greater than] 30 pounds." Pl.'s Ex. 39. Finally, Dr. Bybel presents the report of an expert, Bernd G. Heinze, an attorney and insurance executive, who opines based on his review of the record that MetLife "knew or recklessly disregarded the entirety of the evaluations, reports, and material in its possession and file pertaining to Dr. Bybel." Pl.'s Ex. 52.

I recognize that the record reflects that MetLife retained experts and provided relevant information to specialists for help in assessing Dr. Bybel's claim; that records available to MetLife indicated that Dr. Bybel was able to perform many of the tasks necessary to practice as an OB/GYN; and that although she was terminated from her position, she was immediately offered a replacement position doing gynecological office work. It paid her residual disability benefits for the period from September 21, 2006

through March 15, 2007.

However, MetLife does not offer much in the way of argument against Dr. Bybel's bad faith claim, relying instead on its position that she is not entitled to total disability or residual disability benefits. It claims that a finding from this court that there is no issue of fact whether she is entitled to these benefits precludes a ruling in her favor on the bad faith claim, as she will not be able to show that denial of the benefits was unreasonable.

Because there is an issue of fact whether MetLife breached its contract with Dr. Bybel in denying her total or residual disability benefits, I need not find that there is no basis for a jury to find that its refusal to award her benefits was unreasonable. I recognize that the burden on Dr. Bybel to support her bad faith claim is high, but she has meticulously set forth information showing that MetLife either completely ignored or gave no credit to much of the information she put before it. In addition, it relied on a consultant to issue a decision about her claim but did not provide that consultant with a complete record. MetLife cannot hide behind its hiring of an expert to show the absence of bad faith when it purposefully failed to use that expert to his full capabilities. As a result, I find that Dr. Bybel has demonstrated that a genuine issue of fact remains on her bad faith claim. There is an issue of fact whether MetLife lacked a reasonable basis in denying her benefits, and an issue whether it was reckless. Intentionally limiting the information available to the consultants whose opinions would form the basis for its decision to grant or deny her benefits claim could be found by a jury to be clear and

convincing evidence of bad faith.

**IV. CONCLUSION**

For the reasons set forth above, I will deny the defendant's motion for summary judgment on Counts I, II, and III of Dr. Bybel's complaint.